Filed 1/26/22; See Concurring and Dissenting Opinion

**CERTIFIED FOR PUBLICATION**


**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**


| | |
|---|---|
| MARK RANDALL GREIF,<br>        Cross-complainant and Appellant,<br>v.<br><br>EDDIE SANIN et al.,<br>        Cross-defendants and Respondents. | E070283<br><br>(Super. Ct. No. PSC1301341) |
| THE YARDLEY PROTECTIVE<br>LIMITED PARTNERSHIP,<br>        Plaintiff, Cross-defendant and<br>Respondent,<br><br>v.<br><br>MARK RANDALL GREIF et al.,<br>        Defendants, Cross-complainants<br>and Appellants. | OPINION<br><br>E072143<br><br>(Super. Ct. No. PSC1301341) |
| THE YARDLEY PROTECTIVE<br>LIMITED PARTNERSHIP,<br>        Plaintiff, Cross-defendant and<br>Respondent,<br><br>v.<br><br>MARK RANDELL GREIF, Individually<br>and as Trustee, etc.,<br>        Defendant, Cross-complainant and<br>Appellant. | E073786<br><br>(Super. Ct. No. PSC1301341) |

1

APPEAL from the Superior Court of Riverside County.  James T. Latting, Judge.  Affirmed.

Reed Smith, Raymond A. Cardozo, David J. de Jesus and Kasey J. Curtis; Best Best & Krieger, G. Henry Welles and Gregg W. Kettles, for Appellants Mark Randall Greif and Gabriel Nicholas.

Lewis Brisbois Bisgaard & Smith, Raul L. Martinez and Esther P. Holm, for Cross-Defendants and Respondents, Eddie Sanin and Desert Gate Real Estate.

Rutan & Tucker, Richard K. Howell and Proud Usahacharoenporn, for Plaintiff-Cross-Defendant and Respondent, The Yardley Protective Limited Partnership and Cross-Defendant and Respondent, Sohail Ahmad.

I.

INTRODUCTION

This is a case of seller's remorse.  Appellant, defendant, and cross-complainant Earl Greif[1] sold 10 acres of raw vacant land (Property) in Rancho Mirage to plaintiff and respondent Yardley Protective Limited Partnership, a family real estate investment partnership.  A few days after Earl signed the purchase agreement (Purchase Agreement),[2] he concluded he had sold the Property for less than its fair market value

---

[1]  We mean no disrespect by referring to Earl Greif and other individuals by their first names.  We do so in some instances for purposes of efficiency, brevity, clarity, and avoiding confusion in this opinion.

[2]  Earl signed documents, such as the Purchase Agreement, on behalf of Shirley as her attorney in fact throughout 2012 and 2013, up until her death in April 2013.

(FMV) and attempted to back out of the sale.  The Yardley partnership sued Earl, Earl's wife, Shirley Greif,[3] and Gabriel Nicholas Limited Liability Company (collectively GNLLC) to enforce the Purchase Agreement.

Greif filed a cross-complaint against the Yardley partnership and one of its limited partners, Solail Ahmad (Yardley).  Greif later added as cross-defendants Yardley's real estate brokers, Desert Gate Real Estate, Inc. dba Four Season Realty (Desert Gate) and Desert Gate broker, Eddie Sanin (collectively Sanin).  The trial court dismissed Greif's third amended cross-complaint (Cross-complaint) on the eve of trial for failing to state any cause of action as a matter of law.  After a lengthy court trial, the trial court entered judgment in favor of Yardley and against Greif and GNLLC.

Greif filed three separate appeals.  Greif's first appeal (E070283) challenges the trial court's dismissal of the Cross-complaint.  Greif's second appeal (E072143), joined by GNLLC, challenges the trial judgment in favor of Yardley, ordering specific performance of the Purchase Agreement and damages.  Greif's third appeal (E073786) objects to the trial court's postjudgment order awarding Yardley attorney fees.

---

[3] Earl was named as a defendant in his individual capacity and as trustee of the Shirley Greif Decedent's Trust dated April 10, 2013 and the Shirley Grew Marital Trust dated April 10, 2013.  On February 24, 2016, Earl also died during the course of this lawsuit.  After Earl's death, his son, Mark Randall Greif, substituted in this action as Earl's representative and successor in interest. We refer to the Greif appellants, including Mark Greif, collectively as "Greif," unless stated otherwise.

3

This court ordered the three appeals consolidated for purposes of oral argument and decision, with case no. E070283 designated the master file. The second and third appeals (E072143 & E073786) are consolidated for briefing as well.

We reject Greif and GNLLC's contentions raised in the three appeals. We therefore affirm the judgment on Yardley's second amended complaint (Complaint) and Greif's Cross-complaint, and the postjudgment order awarding Yardley its attorney fees as the prevailing party.

II.

GREIF'S APPEAL OF DISMISSAL OF

THE CROSS-COMPLAINT (First Appeal)

Greif appeals the judgment of dismissal of Greif's Cross-complaint against the buyer's broker, Sanin, after the trial court granted Sanin's motion for judgment on the pleadings on the sole remaining negligence cross-claim. The trial court concluded as a matter of law that Sanin did not owe the seller any duty that Greif alleged was breached. We agree.

A. *Facts and Procedural Background*

Greif filed a Cross-complaint against cross-defendants Yardley and Sanin. The Cross-complaint asserted the following cross-claims: (1) rescission of the Purchase Agreement and damages based on mistake; (2) rescission and damages based on undue influence; (3) negligence; and (4) financial elder abuse. Only the third and fourth causes of action were against Sanin. Prior to the trial court granting judgment on the pleadings

4

on the negligence cause of action, Greif dismissed the fourth cause of action against Sanin for financial elder abuse.

                1.   Greif's Cross-Complaint Allegations Against Sanin

Greif alleged in his Cross-complaint the following facts and contentions. Earl was born on May 3, 1925. Before and or at the time of the events alleged in the Cross-complaint, Earl suffered from a variety of illnesses and disorders, including suffering a heart attack in 2004 and one or more strokes after that, and before December 2012. These illnesses and disorders severely impacted his ability to walk, see, hear, and speak, and impaired his cognitive abilities, which should have been readily apparent to others.

On December 26, 2006, Earl purchased 5.04 acres of raw vacant land for $1,850,000 (Parcel 1). On March 31, 2011, he purchased 5.04 acres of raw vacant land adjacent to Parcel 1 for the sum of $480,000 (Parcel 2). Parcel 1 and Parcel 2 are collectively referred to as the Property. The current FMV of the Property is in excess of $4 million based on recent sales of comparable property in the vicinity of the Property. The FMV of the Property when Yardley and Earl executed the Purchase Agreement was near this amount.

In December 2012, Eddie called Earl and stated that Yardley wished to purchase the Property. Eddie, Ahmad, and Earl met at the Property on December 18, 2012. Earl informed Ahmad and Eddie of his strokes and resultant speech impediment, which was or should have been readily apparent to Ahmad and Eddie. Earl's other health issues and cognitive impairment should have also been readily apparent. Ahmad and Eddie were

also made aware of Earl's advanced age. In addition, Earl's driver, William Harrison, told Ahmad and Eddie that they would need to be directly in front of and close to Earl's face in order for him to more effectively hear and communicate with them.

While Earl was in the van and Ahmad and Eddie were either in the van or directly next to it, the parties negotiated the purchase price for the Property, which ranged from $3,399,000 to $3,380,000 to $3,350,000. Ultimately, the parties agreed on the purchase price of $3,330,000. Due to Earl's poor hearing, speech impediment, and cognitive issues, Ahmad and Eddie may have understood that Earl was willing to sell the Property at a price ranging from $399,000 to $380,000 to $350,000, with an ultimate agreed sales price of $330,000. Later, during the evening of December 18, 2012, the parties met at Earl's home in Rancho Mirage, to execute the Purchase Agreement for the Property.

During Earl's negotiations with Ahmad and Eddie, he stated that the purchase price for the Property was either $3,300,000 or $3,330,000. Due to Earl's speech impediment and cognitive issues, Ahmad and Eddie may have thought Earl agreed to a purchase price of $330,000. Ahmad and Eddie knew or should have known at that time that the $330,000 purchase price for the Property was a small fraction of the Property's FMV and a small fraction of the amount Earl paid for the Property. Nevertheless, the Property Purchase Agreement, which Eddie prepared, stated a purchase price of $330,000.

When presenting the Purchase Agreement to Earl, Eddie pointed out to Earl the purchase price, which was conspicuously stated on the first page of the Purchase

6

Agreement. Eddie did not review with Earl all of the other terms. Ahmad and Eddie directed Earl to initial and sign the Purchase Agreement in a cursory fashion, without reviewing and explaining to Earl the key terms of the Purchase Agreement, and without otherwise ensuring that Earl actually understood the terms, including the stated purchase price.

The circumstances of the parties' execution of the Purchase Agreement and Earl's health and cognitive issues impaired his ability to read and understand the Purchase Agreement. This should have been apparent to Ahmad and Eddie. They thus took advantage of Earl's obvious health conditions and cognitive impairment by having him execute the Purchase Agreement without affording him an adequate opportunity to review the Purchase Agreement or an opportunity to consult his advisors and legal counsel.

Shortly after Earl signed the Purchase Agreement and Ahmad and Eddie left, Earl reviewed the Purchase Agreement. In the absence of Ahmad and Eddie pressuring and distracting him, Earl realized that the purchase price stated in the Purchase Agreement was $330,000, whereas he had understood the agreed purchase price would be $3,300,000 or $3,330,000. Earl immediately called and advised Ahmad or Eddie of the mistake. In response, they assured Earl that Yardley would not open escrow. Contrary to this assurance, Yardley opened escrow on the Purchase Agreement and deposited in escrow the full purchase price stated in the Purchase Agreement, rather than just the initial deposit amount of $30,000. Yardley did so hoping to force consummation of the

7

transaction and take unfair advantage of Earl's health conditions and cognitive impairment.

On November 13, 2014, Earl, with the assistance of legal counsel, rescinded the Purchase Agreement by executing escrow cancellation instructions and offered to compensate Yardley by paying interest on the amount Yardley had deposited in escrow. Yardley refused to execute the proposed escrow cancellation instructions.

In the cross-claim for negligence, Greif alleged that Sanin owed Earl a duty to be honest and truthful during the Property transaction under Business & Professions Code sections 10152, and 10176, subdivisions (a)-(c), and (i).

Greif further alleged Sanin breached a duty owed to Earl by Sanin "having presumed knowledge of the fair market value of the subject Property at the time of preparing and presenting the Purchase Agreement to Greif, and Sanin's failure to raise the gross discrepancy between the true value of the Property and the purchase price stated in the Purchase Agreement." Greif alleges Sanin's acts constituted a breach of duty owed to Earl and dishonest dealing. As a direct and proximate result, Greif allegedly was damaged in a sum in excess of $250,000, which damages include those sustained due to Greif's inability to develop the Property or sell it for its true FMV. Yardley allegedly was jointly and severally liable for Sanin's acts and omissions.

2. Motion for Summary Adjudication

Sanin moved for summary adjudication of Greif's negligence cross-claim. Sanin argued that neither Eddie nor his client, Yardley, owed a duty to advise Eddie during the

8

arm's length transaction that the purchase price should be higher.  Greif filed opposition, arguing Sanin owed Greif a duty of honesty regarding the FMV of the Property.  The trial court denied Sanin's motion for summary adjudication, concluding a buyer's broker[4] owes a duty of care to be honest and truthful to the seller, and Sanin did not demonstrate there were no triable issues of fact.

### 3. Judgment on the Pleadings

On the eve of trial, during a pre-trial dispute over jury instructions on Greif's Cross-complaint, the trial court considered whether to instruct on negligence.  After hearing argument and reviewing the parties' supplemental briefs on the issue, the court ruled Greif had not sufficiently alleged that Sanin owed him any duty that was breached.  The court therefore denied instruction on negligence and granted judgment on the pleadings on the negligence cross-claim against Sanin.  The court further dismissed Sanin from Greif's Cross-complaint because there were no remaining cross-claims against him.

### 4. Bench Trial

After the bench trial on Yardley's Complaint against Greif and GNLCC to enforce the Purchase Agreement, Greif filed a motion for new trial, arguing the trial court erred in dismissing his negligence cross-claim against Sanin.  Greif argued Sanin's testimony during the bench trial on Yardley's Complaint supported a finding Sanin owed a duty of care to Greif that was breached.  Sanin testified he believed he owed a legal duty to all

---

[4] We recognize there is a difference between a real estate broker and real estate agent but, for purposes of this appeal, the difference is immaterial.  Therefore, the two terms are used interchangeably.

9

parties of honesty, fairness, and good faith, including to parties he did not represent, such as the seller. The trial court denied Greif's motion for a new trial, and entered judgment in Yardley's favor on the Complaint and Cross-complaint.

B. *Standard of Review of Judgment on the Pleadings*

This first appeal concerns the trial court's order granting judgment on the pleadings on the sole remaining cross-claim against Sanin for negligence. The standard of review is de novo. (*Ellerbee v. County of Los Angeles* (2010) 187 Cal.App.4th 1206, 1213-1214.) "'A motion for judgment on the pleadings, like a general demurrer, challenges the sufficiency of the plaintiff's cause of action and raises the legal issue, regardless of the existence of triable issues of fact, of whether the complaint states a cause of action. [Citation.]' [Citation.] The standard of review for a motion for judgment on the pleadings is the same as that for a general demurrer. [Citation.] 'We treat the pleadings as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.' (*Ibid*.) '"We review the complaint de novo to determine whether [it] alleges facts sufficient to state a cause of action under any legal theory. [Citations.]"' [Citation.] We review the disposition, not the court's reasons for that disposition. [Citation.]" (*Ibid*.)

C. *Duty Owed by Sanin to Greif*

Greif contends that even though Sanin did not represent him during the sale of the Property, Sanin owed Greif a duty of fairness and good faith, which Sanin breached.

The trial court's judgment on the pleadings and dismissal of the Cross-complaint against Sanin were based on Greif's failure to allege simple negligence against Sanin. The elements of a simple negligence cause of action include a duty to use due care, breach of this duty, and the breach proximately causing injury. (*Easton v. Strassburger* (1984) 152 Cal.App.3d 90, 98 (*Easton*); Civ. Code, § 1714, subd. (a).[5]) The trial court granted judgment on the pleadings on the ground Sanin did not owe Greif any duty alleged in the negligence cross-claim.

"A duty of care may arise in various ways, but the concept of duty is simply a shorthand way of expressing whether the plaintiff's interests are entitled to protection against the defendant's conduct. (*Ibid*.)" (*Earp v. Nobmann* (1981) 122 Cal.App.3d 270, 290 (*Earp*).) "'Real estate brokers are subject to two sets of duties: those imposed by regulatory statutes, and those arising from the general law of agency. [Citation.]'" (*Padgett v. Phariss* (1997) 54 Cal.App.4th 1270, 1279, quoting *Carleton v. Tortosa* (1993) 14 Cal.App.4th 745, 755.) "The existence of a legal duty is a question of law for the court. [Citations.]" (*Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 41 (*Krug*).)

1. Statutory Duty

Relying on section 2079.16, Greif contends that, even though Sanin represented the buyer and not Earl during the real property transaction, Sanin owed Earl a duty of fairness and good faith dealing, which included (1) informing Earl that the sales price

_____

[5] Unless otherwise noted, all statutory references are to the Civil Code.

11

stated in the purchase agreement was excessively low, (2) drafting the Purchase Agreement to state Earl's intended purchase price, rather than the stated purchase price of $330,000, (3) obtaining Earl's informed consent to the 5 percent commission included in the Purchase Agreement, and (4) disclosing to Earl that he had the right to review the Purchase Agreement with an independent advisor. Greif argues that if Sanin had taken any of these precautionary measures, Earl would have discovered the purchase price was incorrect and would not have signed the Purchase Agreement.

At the time Earl signed the Purchase Agreement in December 2012, there was no statutory duty of disclosure owed by a buyer's broker to a seller of vacant land. Section 2079.16, which required agency disclosure, only applied to residential real property transactions. (See former § 2079.13, subds. (j), (k) (Stats.1995, c. 428 (S.B.467), § 2).) It was not until after the Legislature amended section 2079.16, effective on January 1, 2015, that the agency disclosure provision applied to all real property transactions, including transactions involving vacant land. (§§ 2079.13, subds. (j), (k); 2079.14, 20179.16.) As a consequence, section 2079.16 does not apply to the sale of the Property to Yardley in 2012. The parties and their brokers were thus only subject to the common law duties existing at the time of the sale.

In a footnote in Greif's appellant's reply brief, Greif seems to acknowledge that section 2079.16 does not apply, but asserts that "the statutory scheme recognizes real estate brokers owe duties to buyers and sellers, and in this respect, does not differ from what caselaw has consistently held." It is undisputed by the parties that real estate

12

agents, regardless of whether they represent the buyer or seller, owe a duty of care to third parties in a real property transaction. Section 2079.16 does not assist this court in determining the scope of that duty because the agency disclosure statute does not apply here. We therefore must look to common law in determining the extent of Sanin's duty owed to Greif.

2. Common Law Duty

Under common law, generally any person who performs professional services owes a duty of care to all persons within the area of foreseeable risk. (*Krug*, *supra*, 220 Cal.App.3d at pp. 42-43.) The standard of care imposed on a real estate broker thus is higher than that applicable to a layperson. The broker is subject to a duty of skill, care, and diligence commensurate with the professional standards that the real estate industry has held out to the public and that the public reasonably can expect. (*Gardner v. Murphy* (1975) 54 Cal.App.3d 164, 168.) "'The real estate broker is brought by his calling into a relation of trust and confidence. Constant are the opportunities by concealment and collusion to extract illicit gains. . . . [The broker] is accredited by his calling in the minds of the inexperienced . . . with a knowledge greater than their own.'" (*Richards Realty Co. v. Real Estate Com'r* (1956) 144 Cal.App.2d 357, 362; see also *Gardner v. Murphy*, *supra*, at p. 168; *Brady v. Carman* (1960) 179 Cal.App.2d 63, 68.)

The standard of care of a real estate broker can be measured by the Code of Ethics of the National Association of Realtors when the broker is a "realtor" (a member of the National Association or local Board of Realtors). (See 2 Miller & Starr, *California Real*

13

*Estate* § 3:63, p. 3-372 (4th ed. 2015)) (Miller & Starr). As explained succinctly in Miller & Starr, "The Code of Ethics of the National Association of Realtors provides that it imposes 'obligations that may be higher than those mandated by law, (and) in any instance where the Code of Ethics and the law conflict, the obligations of the law must take precedence (preamble)'; *while the obligation of absolute fidelity to the client's interests is primary, this does not relieve the Realtor of an obligation to treat fairly all persons to the transaction* (Article 7)." (Miller & Starr, *supra*, § 3:63, p. 3-372, italics added.)

The extent of the broker's duty of care is determined under common law by examining whether a reasonable person would have foreseen an unreasonable risk of harm to a third party and whether, in view of such risk, the broker exercised ordinary care under the circumstances. (*Krug*, *supra*, 220 Cal.App.3d at pp. 42-43.) Whether a real estate broker has a duty of care to a third party is a question of law that is determined by weighing the following factors: (1) the extent that the transaction was intended to affect the third party; (2) the foreseeability of harm; (3) the degree of certainty that the third party suffered injury; (4) the closeness of the connection between the broker's conduct and the injury suffered; (5) the moral blame attached to the broker's conduct; and (6) the policy of preventing future harm (*Biakanja* duty factors). (*Biakanja v. Irving* (1958) 49 Cal. 2d 647, 650; *J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 804; *Earp*, *supra*, 122 Cal.App.3d at p. 290; *Holmes v. Summer* (2010) 188 Cal.App.4th 1510, 1522 (*Holmes*); *Krug*, *supra*, at p. 42.)

14

Under the common law, "'[t]here is little question that a real estate broker owes a duty of care to third persons in the transaction, where the broker does not have privity with, or fiduciary duties to, such third person.'" (*Krug*, *supra*, 220 Cal.App.3d at p. 42.) "'Despite the absence of privity of contract, a real estate agent is clearly under a duty to exercise reasonable care to protect those persons whom the agent is attempting to induce into entering a real estate transaction for the purpose of earning a commission. [Citations.]'" (*Holmes*, *supra*, 188 Cal.App.4th at p. 1519, quoting *Easton*, *supra*, 152 Cal.App.3d at p. 98, fn. 2.)

The parties agree a buyer's broker owes a duty of care to the seller, even when the broker is the exclusive broker of the buyer. There is thus no question that Sanin owed a duty of care to the seller, Greif, not to impose a foreseeable risk on the seller unreasonably. (*Earp*, *supra*, 122 Cal.App.3d at pp. 290, 292.) The issue here is whether Sanin owed Earl a duty to tell him the purchase price was less than the FMV. We conclude that at the time of execution of the Purchase Agreement there was no such duty.

### 3. Case Law Relied on by Greif

The cases Greif cites for the proposition Sanin, who exclusively represented the buyer, owed Earl a duty to disclose that the purchase price was too low are inapposite. (*Earp*, *supra*, 122 Cal.App.3d at p. 290 [*dual agent* acting for both the buyer and seller]; *Easton*, *supra*, 152 Cal.App.3d at p. 98, fn. 8, 102 [*seller's broker* owes a duty to potential buyer to inspect and disclose all facts materially affecting value or desirability of the property; *Krug*, *supra*, 220 Cal.App.3d 35 [*seller's agent*, who had actual

15

knowledge of unrecorded deed and concealed it, breached duty of honesty, fairness, and full disclosure]; *Holmes*, *supra*, 188 Cal.App.4th at pp. 1518-1519, 1524 [*seller's agent*, who "knows of facts materially affecting the value or desirability of the property which are known or accessible only to him and also knows that such facts are not known to, or within the reach of the diligent attention and observation of the buyer," owes a duty to disclose them to the buyer]; *Saffie v. Schmeling* (2014) 224 Cal.App.4th 563, 568 [discusses duty of the *seller's broker*].) These cases involve the duty of a seller's exclusive agent or a dual agent representing the seller and buyer. They do not address the issue of whether a buyer's broker owes a duty to tell the seller that a purchase price is below FMV.

Greif argues a real estate broker's duty to a third party is the same, whether the broker represents the seller or buyer. Regardless, we conclude Greif's cited cases do not support Greif's allegation that Sanin owed Earl a duty "to raise the gross discrepancy between the true value of the Property and the purchase price stated in the Purchase Agreement." Neither the Legislature nor the courts have recognized such a duty exists where there have been arm's-length negotiations.

Greif argues on appeal that Sanin owed various additional duties that were breached, such as the duty to (1) draft the Purchase Agreement to state Earl's intended purchase price, rather than the stated purchase price of $330,000, (2) obtain Earl's informed consent to the 5 percent commission payable to Sanin, and (3) disclose to Earl that he had the right to review the Purchase Agreement and commission with an

16

independent advisor. But Greif did not allege in his negligence cause of action that Sanin owed Earl these duties or cite any supporting legal authority.

Greif cites *Earp*, *supra*, 122 Cal.App.3d 270, in support of two legal principles: (1) a real estate broker owes a duty of care under negligence principles to other parties in a real property transaction, regardless of whether the broker has a fiduciary, agency, or privity relationship; and (2) a broker, who represents the buyer may owe a duty of care to the seller, "where circumstances warrant." While we agree these principles are well established, *Earp* does not support the proposition that in the instant case the buyer's broker owed the seller a duty to disclose that the purchase price was below FMV.

In *Earp*, *supra*, 122 Cal.App.3d 270, the president of a company signed a written agreement for the sale of real property, but orally stated that his acceptance of the buyer's offer would not be effective until the company's controller could review and approve the offer. (*Earp*, *supra*, at pp. 278, 288.) The court in *Earp* concluded that a contractual agreement had not been reached because the condition precedent had not been satisfied. (*Id*. at pp. 288-289.) Applying the *Biakanja* duty factors, the *Earp* court further found that the dual agent broker owed a duty of care to the seller, which he breached. The broker negligently prepared a purchase offer, which he knew was unacceptable to the seller, and informed the buyer that the offer had been accepted when it had not. (*Earp*, *supra*, at pp. 290-291.)

The instant case is distinguishable from *Earp* in that (1) it is conspicuously stated on the first page of the Purchase Agreement that Sanin was acting as the buyer's

17

exclusive agent, (2) there is no allegation Sanin prepared the Purchase Agreement knowing it was unacceptable to Greif, (3) the real property transaction does not involve an unconsummated purchase agreement subject to an unfulfilled condition precedent; and (4) there is no allegation Sanin knew the Purchase Agreement was unenforceable yet falsely represented it had been accepted, when he had not.

Greif's reliance on *Easton*, *supra*, 152 Cal.App.3d at page 98, is also misplaced. In *Easton*, the seller's broker was aware of facts indicating soils problems but did not request further investigation and did not disclose to the buyer that there were soils problems or a history of slides on the property. The buyer sued the seller's broker for negligence. The jury returned a verdict against the seller's broker on the negligence claim for nondisclosure. The *Easton* court held the seller's broker owed the buyer duties of disclosure and to investigate. (*Easton*, *supra*, at pp. 99, 102.) The court in *Easton* explained that this was implicit in common law, which was intended "to protect the buyer from the unethical broker and seller and to ensure that the *buyer* is provided sufficient accurate information to make an informed decision whether to purchase." (*Easton*, *supra*, at p. 99, italics added.)

*Easton* is distinguishable in that *Easton* concerns nondisclosure by the *seller's broker* to a prospective residential buyer of material facts, which the buyer did not know or, which through reasonable diligence, would not have been able to discover before purchasing the property. In *Easton*, the court noted that "[c]ases will undoubtedly arise in which the defect in the property is so clearly apparent that as a matter of law a broker

18

would not be negligent for failure to expressly disclose it, as he could reasonably expect that the buyer's own inspection of the premises would reveal the flaw.  In such a case the buyer's negligence *alone* would be the proximate cause of any injury he suffered." (*Easton*, *supra*, 152 Cal.App.3d at p. 103.)

Here, the purchase price information that Greif alleges Sanin negligently failed to disclose to Earl was known or should have been known by Earl, as seller, such that Sanin did not owe him a duty to disclose it.  (*Kahn v. Lischner* (1954) 128 Cal.App.2d 480, 487 ["[T]he law generally assumes one will have some knowledge of the value of that which he owns."].)

Greif also relies on *Krug*, *supra*, 220 Cal.App.3d 35, which is inapposite.  In *Krug*, Norman Krug, a real estate investor, and his partner, Dr. Robert Gilbert, purchased an apartment building.  Krug deeded his share of the property to Gilbert in return for a promissory note secured by an unrecorded third deed of trust on the property.  Gilbert defaulted on the property loan and hired real estate broker Roman Praszker to list the property for sale.  Praszker sold the property without informing Krug that the sale was pending or advising the buyer of Krug's unrecorded lien.  As a result, the buyer took the property free and clear of Krug's deed of trust, and Krug's security interest was extinguished.  Krug sued Praszker for failing to disclose the lien to the buyer and failing to inform Krug of the impending sale, which would have alerted Krug of the need to record his lien.  The trial court entered judgment in favor of Krug, finding Praszker had breached his duty of disclosure to Krug and the buyer.  (*Krug*, *supra*, at p. 43.)

19

On appeal, the court in *Krug* upheld the trial court's determination that the broker breached his duty to third parties who were foreseeably harmed by the broker's action. (*Krug*, *supra*, 220 Cal.App.3d at p. 43.)  The *Krug* court explained that, under California case law, there is "a fundamental duty on the part of a realtor to deal honestly and fairly with all parties in the sale transaction.  [Citations.]  'There is little question that a real estate broker owes a duty of care to third persons in the transaction, where the broker does not have privity with, or fiduciary duties to, such third person." (*Krug*, *supra*, at p. 42.)  The *Krug* court further stated that the extent of that duty imposed on the broker is determined by weighing the *Biakanja* duty factors.  (*Krug*, *supra*, at p. 42.)

The court in *Krug* noted that the Code of Ethics of the National Association of Realtors provided that a realtor is obligated to treat fairly all persons to the transaction. (*Krug*, *supra*, 220 Cal.App.3d  at p. 42.)  The preamble to the National Association of Realtors' Code of Ethics states that, "'The term Realtor has come to connote competency, fairness, and high integrity resulting from adherence to a lofty ideal of moral conduct in business relations.  No inducement of profit . . . can justify departure from this ideal.'" (*Krug*, *supra*, at p. 43.)  The *Krug* court emphasized that, "[t]he most important step in determining if a broker owes a duty of care to a third party is to examine 'whether a reasonable person would have foreseen an unreasonable risk of harm to the third person and whether in view of such risk the broker exercised ordinary care under the circumstances.'" (*Id*. at p. 42.)  The *Krug* court added that "[b]oth the policy of preventing future harm and considerations of moral blame compel the imposition of a

20

duty on the part of a realtor never to allow a desire to consummate a deal or collect a commission to take precedence over his fundamental obligation of honesty, fairness and full disclosure toward all parties." (*Id*. at p. 43.)

*Krug* is instructive but not dispositive here because it does not address the issue of whether a buyer's broker owes the seller a duty to tell the seller that the purchase price is too low. Also, *Krug* is distinguishable in that *Krug* concerns the seller's broker failing to disclose information to his own client, and failing disclose to the buyer a known unrecorded lien on the property, which the buyer would not normally be aware of before agreeing to the purchase. The instant case, on the other hand, concerns whether the buyer's broker owed a duty to provide the seller with information about the purchase price, which the seller could be reasonably expected to know. While *Krug* states that there is a "fundamental obligation of honesty, fairness and full disclosure toward all parties (*Krug*, *supra*, 220 Cal.App.3d at p. 43), *Krug* does not support the proposition that, under the facts alleged in the instant case, the buyer's broker owed a duty to disclose to the seller that the purchase price was below FMV.

Greif's reliance on *Holmes*, *supra*, 188 Cal.App.4th at p. 1518, is also misplaced. In *Holmes*, the seller's broker failed to disclose to the buyer that the purchased residential property was over-encumbered with debt. The *Holmes* court held that the seller's "brokers were obligated to disclose to the buyers that there was a substantial risk that the seller could not transfer title free and clear of monetary liens and encumbrances." (*Id*. at p. 1515.) The *Holmes* court acknowledged the well-established rule that the seller's

21

broker owes the buyer a duty to disclose, when the seller's broker "knows of facts materially affecting the value or desirability of the property which are known or accessible only to him and also knows that such facts are not known to, or within the reach of the diligent attention and observation of the buyer." (*Id*. at pp. 1518-1519) In determining whether the seller's broker owed the buyer a duty of disclosure under the facts in *Holmes*, the *Holmes* court applied the *Biakanja* duty factors, and concluded all six factors weighed in favor of finding a duty of disclosure. (*Holmes*, *supra*, at p. 1522)

Unlike in *Holmes*, Greif did not allege in his negligence cause of action that Sanin was dishonest or failed to disclose facts which were known or accessible only to Sanin, and which Sanin knew were "not known to, or within the reach of the diligent attention and observation" of Earl. (*Holmes*, *supra*, 188 Cal.App.4th at p. 1518.) Sanin thus did not have a duty to tell Earl he was selling his property for less than the FMV, when Earl knew or should have known the value of his own property before selling it. As the *Holmes* court noted, "the information in question must be unknown to, or outside 'the diligent attention and observation of the buyer. . . . ,'" or in this case, the seller. (*Id*. at p. 1520, quoting *Lingsch v. Savage* (1963) 213 Cal.App.2d 729, 735.) This was not the case here. Sanin also owed no duty to Earl to explain the significance of facts that were readily accessible or observable by Earl. (*Peake v. Underwood* (2014) 227 Cal.App.4th 428, 445 [seller's agent had no duty to buyer to disclose or explain significance of facts where seller had furnished buyer with disclosures and reports.].)

22

Greif also cites *Saffie v. Schmeling*, *supra*, 224 Cal.App.4th at p. 568, for the well-established proposition a broker owes third parties, including an adverse party in a real estate transaction, duties of "honesty, fairness and full disclosure." As we already noted, this principle is undisputed. The issue here is whether under the *Biakanja* duty factors, Sanin owed Earl a duty of fairness and disclosure of the fact the purchase price was below FMV.

### 4. Applying the *Biakanja* Duty Factors

Applying the six *Biakanja* duty factors, we conclude Sanin did not owe a duty to tell Earl the purchase price stated in the Purchase Agreement was below FMV. The first three factors weigh in favor of finding a duty of care. As to the first factor, the extent to which the transaction was intended to affect the third party, it is undisputed the real property transaction was intended to directly affect Earl as seller. As to the second factor, foreseeability of harm, it was foreseeable that Earl would allegedly receive less than the FMV for the Property. However, it was not foreseeable Earl did not know the FMV of his property. As to the third factor, the degree of certainty that the third party suffered injury, the Cross-complaint alleges sufficient facts that Greif suffered injury by selling the Property for less than its FMV.

The fourth factor concerns the closeness of the connection between Sanin's conduct and Greif's injury. While there is an alleged connection, it is not close. Had Eddie mentioned to Earl that the purchase price was below FMV, this might have alerted Earl that the purchase price stated in the Purchase Agreement was $330,000, not

23

$3,300,000. But Eddie pointed out to Earl the $330,000 purchase price stated conspicuously on the first page of the Purchase Agreement, before Earl signed the agreement.

Greif argues the connection was close, not only because Eddie did not tell him the purchase price was a fraction of the FMV, but also because Eddie did not confirm in writing that he did not represent Earl; Eddie did not provide Earl with a sufficient opportunity to review the agreement or consult with independent advisors; and Eddie did not require Earl to confirm in writing that he was of sound mind and freely elected to proceed unrepresented. But Greif did not allege in his negligence cause of action that Sanin owed a duty to perform these additional acts or that the alleged omissions constituted a breach of duty. Even taking into consideration the additional factors, we reject Greif's argument there was a close connection between Sanin's alleged omissions and an injury suffered by Greif.

As to the fifth factor, the moral blame attached to the broker's conduct, Greif argues there was moral blame because the sales price was extremely low; Earl was 87 years old; he had obvious physical and cognitive impairments; Eddie rushed to consummate the real property transaction; Eddie drafted the Purchase Agreement at Earl's request; and Eddie benefited from the transaction by receiving a 5 percent commission, which was not negotiated.

These facts demonstrate little, if any, moral blame attached to Eddie's conduct. This is not a case in which the buyer's broker failed to disclose material facts known

24

exclusively to the buyer's broker or buyer. In addition, Greif alleged in his Cross-complaint that Eddie might not have been aware that Earl stated or intended a sales price of $3,300,000, rather than $330,000. There are no allegations of dishonesty, concealment, misrepresentation, or fraud committed by Eddie. There are also no allegations that Eddie knew that the stated price in the Purchase Agreement was not what Eddie had orally agreed to during negotiations. In addition, Eddie showed Earl the Purchase Agreement, which had the $330,000 purchase price on the first page of the agreement.

As to the sixth factor, the policy of preventing future harm, we conclude holding a buyer's broker liable for not telling the seller the purchase price is below FMV is not an appropriate, necessary means of preventing a seller, even one such as Greif, from selling property for less than the FMV. Other more appropriate measures are available to protect a seller, such as the seller diligently investigating the value of a property, obtaining a property appraisal before placing the property on the market, retaining an exclusive or dual real estate agent, and taking into consideration facts about the property known by the seller.

Under the circumstances in this case, there is no policy justification for placing the burden on the buyer's exclusive broker to inform the seller that the purchase price is below FMV. The purpose of a seller and buyer having the option of being represented by separate real estate agents is to protect the buyer and seller's unique and antagonistic interests; that of the buyer seeking to purchase the property for as low a price as possible,

25

and the seller attempting to sell the property for as high a price as possible. For this reason, each party benefits from retaining his/her own agent. The purchase price of real property is contingent upon many factors, including such factors as the current state of the real estate market and economy, encumbrances against property, the previous purchase price of the property paid by the seller, the seller's motivation for selling the property, and how quickly the seller desires to sell the property. These are generally factors within the knowledge of the seller or easily ascertainable by the seller. This case is not analogous to *Holmes*, in which there were undisclosed facts known or accessible only to the buyer's broker, which were "not known to, or within the reach of the diligent attention and observation" of the seller. (*Holmes*, *supra*, 188 Cal.App.4th at p. 1518.)

It is inappropriate, here, to place the burden on the buyer's broker, Sanin, to inform the seller, Earl, that the purchase price is below FMV, where Earl had access to information relevant to the FMV, could research the FMV, and could retain a real estate agent to advise and assist him in determining the sales price, yet chose not to do so at his own peril. Placing such a burden on the buyer's broker under these circumstances would wreak havoc on real estate transactions and client/agent relationships (dueling duties).

We thus conclude that, even under the facts alleged in this case, where the seller is elderly and physically infirm, public policy does not favor holding the buyer's agent responsible for informing the seller that the agreed upon purchase price is below FMV. That is the responsibility of the seller's broker and, if the seller chooses not to retain a real estate agent or advisor, the seller is responsible for investigating the value of the

26

Property and determining the sales price. (*Holmes*, *supra*, 188 Cal.App.4th at p. 1518; *Kahn*, *supra*, 128 Cal.App.2d at p. 487 ["[T]he law generally assumes one will have some knowledge of the value of that which he owns."].)

We conclude that, as a matter of law, Greif has not alleged facts establishing that Sanin owed a duty to advise Greif that the purchase price was less than the FMV or any other alleged breached duty. Therefore, the trial court did not err in granting judgment on the pleadings on Greif's negligence cause of action against Sanin.

III.

GREIF AND GNLLC'S APPEAL OF JUDGMENT

ON YARDLEY'S COMPLAINT (Second Appeal)

In the second appeal (case no. E072143), appellants Greif and GNLLC (Greif/GNLLC) contend (1) the trial court erred in rejecting his unilateral mistake defense; (2) the trial court abused its discretion in awarding Yardley specific performance of the Purchase Agreement; and (3) the trial court erred in granting duplicative conversion damages and failed to credit Greif for paying property taxes on the Property.

A. *Factual and Procedural Background*

The day after Earl signed the Purchase Agreement on December 18, 2012, Eddie opened escrow and Yardley paid the $30,000 deposit. A few days later, Earl called Eddie and requested to cancel the transaction because he believed he had sold the Property for less than its FMV. Eddie told Ahmad, who said he wanted to go forward with the

27

transaction. In January 2013, Yardley deposited in escrow $305,000, which was the remainder of the purchase price, plus $5,000 in estimated closing costs.

After Sanin and Yardley requested Earl to perform the Purchase Agreement and got no response, in March 2013, Yardley signed escrow cancellation instructions, which the escrow company required both parties to sign before releasing Yardley's money. Earl did not respond to Yardley's requests to do so or comply with the Purchase Agreement terms. As a result, in September 2013, Yardley filed the instant lawsuit against Greif/GNLLC to enforce the Purchase Agreement. Yardley's Complaint against Greif/GNLLC asserts causes of actions for breach of contract/specific performance, conversion, and fraudulent transfer.

After Yardley filed its lawsuit against Greif, Earl signed escrow cancellation instructions in November 2013, but they were contingent upon Yardley waiving its right to proceed with its lawsuit. Yardley was not willing to waive its rights to enforce the Purchase Agreement and recover its expenses and damages incurred as a result of Earl's delay in signing escrow cancellation instructions and failure to comply with the Purchase Agreement. Therefore, Yardley refused to sign Earl's proposed escrow cancellation instructions.

In December 2014, Earl and Yardley signed escrow cancellation instructions which did not require Yardley to release any of its rights related to its lawsuit against Greif/GNLLC. This resulted in the unconditional release of Yardley's funds ($335,000)

28

on January 30, 2015. Efforts to resolve the instant lawsuit informally and by mediation were unsuccessful, and the matter proceeded to trial.

After conducting a court trial lasting over a month, the trial court provided a detailed statement of decision (SOD) and entered judgment in favor of Yardley and against Greif/GNLLC. The judgment enforced the Purchase Agreement, thereby requiring Greif/GNLLC to sell the Property to Yardley and transfer title to Yardley in accordance with the Purchase Agreement, in return for payment by Yardley of $330,000 to Greif. The judgment further awarded Yardley $43,040.80 in conversion damages, consisting of the interest that accrued during retention of Yardley's money by the escrow company during Earl's delay in signing the escrow cancellation instructions. In addition, the trial court awarded Yardley, as prevailing party, its costs and attorney fees, to be determined at a later date.

Additional pertinent facts and evidence produced at trial are summarized below, where relevant to the issues addressed.[6]

B. *Standard of Review*

The trial court's detailed SOD contains both findings of fact and conclusions of law. "We review the court's findings of fact for substantial evidence. [Citations] Under that standard, our review begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, to support the findings below.

---

[6] A detailed statement of the facts and evidence presented during the trial is provided in the trial court's statement of decision and in the parties' appellate brief statements of facts.

29

[Citations.]  In assessing whether any substantial evidence exists, we view the record in the light most favorable to respondents, giving them the benefit of every reasonable inference and resolving all conflicts in their favor.  [Citation.]  '[I]t is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it.'  [Citations.]  [¶]  Where the trial court used findings of fact in drawing conclusions of law, we independently review the conclusions of law.  [Citations.]" (*Williamson v. Brooks* (2017) 7 Cal.App.5th 1294, 1299-1300.)

C.  *Unilateral Mistake Defense*

Greif/GNLLC contends it met its burden of proving the unilateral mistake defense and, therefore, the trial court erred in ordering the Purchase Agreement enforced, instead of rescinded.

"A party may rescind a contract if his or her consent was given by mistake.  (Civ. Code, § 1689, subd. (b)(1).)  A factual mistake by one party to a contract, or unilateral mistake, affords a ground for rescission in some circumstances." (*Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 278 (*Donovan*).)  Section 1577 defines "mistake of fact" as "a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in:  [¶]  1. An unconscious ignorance or forgetfulness of a fact past or present, material to the contract; or,  [¶]  2. Belief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed."

30

The trial court found Greif/GNLLC had not met this burden of establishing clear, convincing, and satisfactory evidence of the unilateral mistake defense under *Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667 (*Brookwood*), and *Bunnet v. Regents of University of California* (1995) 35 Cal.App.4th 843 (*Bunnet*). The trial court concluded in its SOD that (1) there was insufficient evidence of a mistake by Earl; (2) there was insufficient evidence that Ahmad or Eddie knew of any mistake; (3) there was insufficient evidence Ahmad or Eddie did anything to encourage or foster any mistake; and (4) any mistake was caused by the neglect of Greif and his representatives.

Even though Greif/GNLLC cites evidence refuting these findings, we affirm the trial court's findings because there was substantial evidence supporting them. "In assessing whether any substantial evidence exists, we view the record in the light most favorable to respondents, giving them the benefit of every reasonable inference and resolving all conflicts in their favor. [Citation.] '[I]t is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it.' [Citations.]" (*Williamson v. Brooks*, *supra*, 7 Cal.App.5th at pp. 1299-1300.)

Greif argues that the trial court's SOD reflects that the trial court failed to consider the correct unilateral mistake defense elements stated in *Donovan*. The trial court cited *Donovan*, *supra*, 26 Cal.4th at page 284, in its SOD, but only did so when noting that the failure to use reasonable measures to avoid a mistake is a proper ground for rejecting the unilateral mistake defense. The trial court did not cite the *Donovan* elements required for

31

establishing a unilateral mistake defense. Instead, the trial court relied on case law preceding *Donovan* (*Brookwood*, *supra*, 45 Cal.App.4th 1667, and *Bunnet*, *supra*, 35 Cal.App.4th 843), which relied on essentially the same elements in *Donovan*, with the exception of the knowledge element rejected by *Donovan*.

Our high court in *Donovan* concluded that the courts in *Brookwood* and *Bunnet* erroneously held that "California law allows rescission of contract for a unilateral mistake only 'when the unilateral mistake is known to the other contracting party and is encouraged or fostered by that party.'" (*Brookwood*, *supra*, 45 Cal.App.4th at pp. 1673-1674; see also *Bunnet*, *supra*, 35 Cal.App.4th at pp. 854-855.) The court in *Donovan* held that this was error "to the extent it suggested that a unilateral mistake of fact affords a ground for rescission only where the other party is aware of the mistake." (*Donovan*, *supra*, 26 Cal.4th at p. 279.) In all other respects, the factors the trial court considered in the instant case are consistent with *Donovan*.

Even though the trial court did not specifically address in the SOD each of the four *Donovan* factors, the trial court sufficiently addressed them indirectly. The trial court found there was insufficient evidence of a material mistake by Earl; there was insufficient evidence either Ahmad or Eddie did anything to encourage or foster any alleged mistake; and any alleged mistake was caused by the neglect of Earl and his representatives. The trial court's findings are consistent with rejecting the unilateral mistake defense under *Donovan*.

In *Donovan*, an automobile dealer advertised a car for sale in a newspaper. The newspaper made typographical and proofreading errors that resulted in the advertisement misstating the car's purchase price. The plaintiff buyers offered to pay the advertised price for the car. The dealer refused the offer. The buyers sued the dealer for breach of contract. (*Donovan*, *supra*, 26 Cal.4th at pp. 266-267.) The *Donovan* court held rescission of the contract based on mistake of fact was warranted because the seller's unilateral failure to discover the typographical and proofreading errors was made in good faith, the seller did not bear the risk of the mistake, and enforcement of the contract with the erroneous price would be unconscionable. (*Id*. at p. 267.)

In *Donovan*, the California Supreme Court stated that, "[w]here the plaintiff has no reason to know of and does not cause the defendant's unilateral mistake of fact, the defendant must establish the following facts to obtain rescission of the contract: (1) the defendant made a mistake regarding a basic assumption upon which the defendant made the contract; (2) the mistake has a material effect upon the agreed exchange of performances that is adverse to the defendant; (3) the defendant does not bear the risk of the mistake; and (4) the effect of the mistake is such that enforcement of the contract would be unconscionable." (*Donovan*, *supra*, 26 Cal.4th at p. 282.)

Greif/GNLLC argues that the evidence established that (1) Earl made a mistake when signing the Purchase Agreement, agreeing to the $330,000 purchase price, (2) the mistake had a material effect on him signing the Purchase Agreement, resulting in Earl selling the Property for less than its FMV, (3) Earl did not bear the risk of the mistake,

33

and (4) enforcement of the Purchase Agreement would be unconscionable because Earl was elderly, had physical and mental disabilities, was rushed into signing the Purchase Agreement, and sold the Property for less than the FMV.

We begin by determining whether there was substantial evidence supporting the trial court's finding there was no material mistake of fact relied upon by Earl when he signed the Purchase Agreement. Without a material mistake of fact, Greif/GNLLC cannot prevail on its unilateral mistake defense. Based on our review of the evidence presented at trial, we conclude there was substantial evidence to support the trial court's finding that Earl did not make a material mistake of fact when he signed the Purchase Agreement. There was evidence that, at the time of the sale, Earl was mentally and physically capable of comprehending, reading, hearing, and negotiating the sale of the Property, and was competent when executing the Purchase Agreement.

In addition, there was compelling evidence that Earl competently negotiated the purchase price and knowingly agreed to sell the Property for $330,000 when he signed the Purchase Agreement. It was not until a few days later, after a friend told him the price was too low, that he attempted to back out of the Purchase Agreement by claiming he thought the purchase price was in the $3 million range.

The trial court noted in its SOD that, even if Earl may have thought he had stated during negotiations an agreed-upon price in the three million dollar range, there was no evidence he actually stated such a price. Earl's assistant and driver, Robert Harrison, testified Earl would always say the price was in the $300,000 range, even though

34

Harrison thought Earl meant to say a price in the three million dollar range. There was no evidence Earl had difficulty hearing when negotiating with Eddie and Ahmad, or that Earl, Eddie or Ahmad stated any potential prices other than in the $300,000 range.

In addition, there was evidence that, when Earl met with Eddie and Ahmad and signed the Purchase agreement, Earl looked at the Purchase Agreement while Eddie showed him the first page of the agreement, which showed the $330,000 purchase price conspicuously stated in several places on the first page. Harrison testified that he was sure that, if Earl saw the $330,000 purchase price in writing, he would have been able to read the price accurately. Harrison said he had "no concern" at that time about Earl's ability to read and understand documents and to accurately read numbers. At that time, Harrison felt positive that, "if the contract said 330,000 and Mr. Greif intended it to say 3.3 million, [Mr. Greif] would have caught that difference." Harrison further testified that, at the time of the negotiations between Earl and Yardley, Harrison thought Earl "was entirely capable of negotiating his deals."

There was additional evidence that Earl had signed numerous other contracts in late 2012 and throughout 2013, with no evidence he had any problem reading or understanding the contracts during that time. Earl's assistant, Jay Sese, testified on cross-examination that he did not start having concerns about Earl's mental health until November 2013. Before that, in 2012 and 2013, Sese had entered into numerous agreements with Earl relating to real properties, some of which were drafted by Earl in

2012. Earl had also signed lease agreements in September 2012, which Sese believed Earl understood what he was signing.

The trial court found that "Mr. Greif may have been subjectively mistaken about the value of the Property, and later determined the Property was worth some unspecific amount more than the negotiated purchase Price." The court added that "[t]his explains Mr. Greif's initial comments to both Mr. Sanin (as confirmed by Dijana Arbaugh) and to Jay Sese that he wanted to cancel the transaction because he sold the Property too cheap, not because of any factually mistaken belief the price expressed on the contract was actually $3,330,000, $3,300,000, or $3,000,000." Eddie, his assistant, Dijana Arbaugh, and Ahmad testified that a few days after Yardley made the initial $30,000 deposit on December 20, 2012, Earl called Eddie and said he wanted to cancel the Purchase Agreement because he spoke to one of his good friends who told Earl he sold the Property "too cheap." Earl did not mention he had made any mistake about the price stated in the Purchase Agreement or that he thought he had sold the Property for $3.3 million.

We thus conclude there was substantial evidence supporting the trial court's findings that Earl did not make a mistake of fact as to the agreed upon purchase price of $330,000 when he signed the Purchase Agreement; there was no miscommunication or confusion by Earl during the Property transaction negotiations or signing of the Purchase Agreement; there was no misunderstanding of the terms of the Property sale by Earl due to any physical or mental issues; Earl did not misread or miscomprehend the purchase

36

price stated in the Purchase Agreement; and Eddie did not err in drafting the Purchase Agreement to reflect the terms orally agreed upon.

As the trial court correctly noted in the SOD, Greif/GNLLC was not entitled to relief under the unilateral mistake of fact defense where the evidence showed that any error on Earl's part was due to his error in judgment in selling the Property for what he later believed was too low a sales price. As the trial court noted, "Such ignorance or erroneous belief as to the mere value of property [does not] amount [] to mistake of fact as defined in section 1577, Civil Code. (*Tetenmant v. Epstein* (1924) 66 Cal.App. 745, 751) Therefore, Defendants [Greif/GNLLC] could not rely on a mere mistake by Mr. Greif as to value of the Property but instead had the burden of showing by 'clear, convincing and satisfactory' evidence that Mr. Greif made the mistake of believing he had actually contracted to sell the Property for $3.3 million." The trial court reasonably found there was insufficient evidence to support such a finding.

Furthermore, any mistake Earl made in setting the purchase price too low does not amount to the type of mistake of fact that qualifies for rescission under the unilateral mistake of fact defense. Merely making a mistake as to the Property's value is not a valid basis for rescinding the Purchase Agreement based on the unilateral mistake defense. (See § 1577.) Earl bore the risk of any mistake in setting the purchase price too low because he was responsible for investigating, evaluating, and determining the purchase price for the Property. As a consequence, enforcing the Purchase Agreement was not unconscionable.

37

Greif/GNLLC argues there was evidence supporting a finding Earl made a mistake of fact as to believing the purchase price was different than what was stated in the Purchase Agreement. But this court is required to give deference to the factual findings made by the trial court, where there is substantial evidence supporting them. (*Williamson v. Brooks*, *supra*, 7 Cal.App.5th at pp. 1299-1300.) In doing so, we conclude there was substantial evidence supporting the trial court's rejection of the unilateral mistake defense. Because substantial evidence supports the trial court's key finding that there was no material mistake of fact, we need not discuss further the other *Donovan* factors.

D. *Specific Performance*

Greif contends that even if the Purchase Agreement is an enforceable contract, specific performance is not an available remedy because there was inadequate consideration and Earl did not own the Property at the time he signed the Purchase Agreement. We disagree.

1. Standard of Review of Adequacy of Consideration

Section 3391 provides in relevant part that "[s]pecific performance cannot be enforced against a party to a contract . . . . [¶] [i]f he has not received an adequate consideration for the contract," as measured at the time the contract was made. (§ 3391; *Steiner v. Thexton* (2010) 48 Cal.4th 411, 424.) Since the remedy of specific performance is a discretionary, equitable remedy, we apply the abuse of discretion standard of review, but as to underlying findings of fact, we apply the substantial evidence standard of review. (*Petersen v. Hartell* (1985) 40 Cal.3d 102, 110; *Williamson*

*v. Brooks*, *supra*, 7 Cal.App.5th at pp. 1299-1300; *Maxfield v. Burtt* (1953) 121 Cal.App.2d 102, 115-116.)

> 2. Expert Testimony

Greif/GNLLC argues Yardley did not provide adequate consideration for the Purchase Agreement because the purchase price of $330,000 was a fraction of the FMV of the Property. The parties introduced expert opinion testimony to assist the court in assessing the adequacy of the consideration. The value of the property at the time of the Purchase Agreement is a question of fact. As such, we apply the substantial evidence standard of review, giving deference to the trial court's Property value findings. (*Gilbert v. Mercer* (1960) 179 Cal.App.2d 29, 31; *Williamson v. Brooks*, *supra*, 7 Cal.App.5th at pp. 1299-1300.)

The trial court stated in its SOD that, in assessing the Property's value, it took into consideration expert opinion testimony regarding the value of the property provided by both parties' experts. Greif's expert, Noble Tucker, Jr., appraised the Property at $1.25 million. Yardley's expert, Steven Fontes, appraised the Property at $705,000. Based on additional evidence affecting the value of the Property, the trial court found that the Property value was in the $500,000 range, and the $330,000 purchase price was "substantially fair and just under all of the circumstances of the case."

"It is the universal rule that the market value of property is measured by the highest price estimated in terms of money which the land would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying

39

with knowledge of all the uses and purposes to which it was adapted and for which it was capable." (*Milton Kauffman, Inc., v. Smith* (1947) 82 Cal.App.2d 302, 304.) Thus, "'[i]n determining whether consideration was fair and adequate, all circumstances surrounding the transfer of the property as they existed at that time, must be considered.' [Citation.] 'A *consideration*, to be adequate, *need not amount to the full value of the property*.' [Citation.] The test 'is not whether the [vendor] received the highest price obtainable for his property, but whether the price he received is fair and reasonable under the circumstances.' [Citation.]" (*Meyer v. Benko* (1976) 55 Cal.App.3d 937, 945, italics added.)

Greif/GNLLC argues the trial court erred in finding the purchase price fair and reasonable because the trial court disregarded the expert testimony valuations of the property, which were much higher than the $330,000 purchase price. Even the trial court's estimate of $500,000 was much higher. Greif/GNLLC asserts that under Evidence Code section 813 and case law, the trial court was precluded from making its own valuation of the Property.

Evidence Code section 813 provides in relevant part: "(a) The value of property may be shown only by the opinions of any of the following: [¶] (1) Witnesses qualified to express such opinions. [¶] (2) The owner . . . of the property or property interest being valued. . . . [¶] (b) Nothing in this section prohibits a view of the property being valued or the admission of any other admissible evidence (including but not limited to evidence as to the nature and condition of the property . . . ) for the limited purpose of enabling the

court . . . to understand and weigh the testimony given under subdivision (a); and such evidence . . . is subject to impeachment and rebuttal."

Evidence Code section 813 does not preclude the court from assessing the value of real property differently than the value stated by an expert based on other relevant evidence. (*Escondido Union School Dist. v. Casa Suenos De Oro, Inc.* (2005) 129 Cal.App.4th 944, 982.) Subdivision (b) of Evidence Code section 813 clarifies that the trial court can consider other relevant evidence when considering and weighing expert testimony. A court is thus not bound by the property value assessments provided by the experts, where other evidence supports rejection of the expert's property value assessment. (*Escondido*, *supra*, at p. 982.)

1. Substantial Evidence Supporting the Trial Court's Value Finding

The trial court explained in the SOD that the true market value of the Property might be less than Fontes's appraisal of $705,000, and was worth closer to $500,000, "given significant issues getting water to the Property that were not taken into consideration in Mr. Fontes' appraisal." The evidence supporting the trial court's finding of adequate consideration includes testimony by Yardley's expert, Steven Fontes, who stated that Earl purchased Parcel 1 in 2006, at the peak of the market for $1.25 million. Earl purchased in 2011, Parcel 2, which was the same size as, and adjacent to, Parcel 1, for $480,000. Thereafter, on March 24, 2011, the county tax assessor assessed Parcel 2 at $403,200. This reflected the decline in the market. According to Fontes, in 2008 there was a real estate market "crash," with a slow recovery over several years. In 2010

41

through 2012, countywide, residential land was selling below $50,000 an acre on average. In 2013, the price shot up to $90,000 per acre. Fontes stated that, "when there's a downturn in the market, the parcels that tend to get hit the hardest are the ones that are not as far along in the development cycle." There was a "lag" in the vacant land market recovery.

Fontes testified that the Property was unimproved, raw, "unentitled," vacant residential land. Its development potential was low because it appeared to lack "entitlements" and "off-sites," such as utilities (water, sewer, gas, electric, telephone), gutters, streetlights, storm drains, and sidewalks. Fontes stated he did not have "specifics" on the utilities or know where they were located. There appeared to be utilities nearby but not on the Property.

Fontes conducted a "Sales Comparison Approach," which provided an analysis based on comparable sales ("comps"), consisting of other similar raw land property in the same neighborhood as the subject Property. The comps were used for a value comparison with the subject Property's value in December 2012. The comps Fontes considered ranged from $52,250 an acre to $80,870 an acre. Fontes also found comps in the $30,000 to $50,000 range but did not consider them in his analysis for various reasons, such as lot size and location. Fontes concluded the Property value was $70,000 an acre. He did not give much consideration to the $52,000 comp because the other five comps were in the $70,000 range. Fontes testified that Greif/GNLLC's expert's appraisal of the Property, of $1.25 million, was "ridiculous."

42

Ahmad testified that at the time of the Property transaction in 2012, the real estate market had been trending downward for the past six years. The peak in the market in California was in 2006. This was why Ahmad wanted to purchase investment property when he purchased Earl's Property. Ahmad was looking for property selling in the $20,000 to $30,000 per acre range. Someone he knew said he could not go wrong purchasing raw land for $20 to $30 thousand per acre. He found a 10-acre property in Indio, in 2012. The raw land was listed for $500,000 or $600,000. In 2006, it had been listed for $1.83 million. It had utilities and some infrastructure. Ahmad did not buy the land because the seller was willing to sell it for $280,000, but Ahmad did not want to pay more than $230,000. There were lots of raw land parcels available for sale that were being sold at depressed values. Ahmad's initial offer on the Property was $200,000.

The trial court found Fontes's appraisal of the Property more credible than Tucker's appraisal. The court also found the Property's actual value was lower than Fontes's $705,000 appraisal because Fontes "did not take into consideration the significant issues bringing water to the Property testified to by Bruce Maize and Brian Orr." The trial court noted Tucker acknowledged that such a factor would have a material impact on the appraised value of the Property. The court also noted Fontes used comparable sales of $52,000 an acre, for raw land located in close proximity to the Property and sold near the time of the Property's sale.

Developers Bruce Maize and Brian Orr testified they attempted to develop the Property for Earl in 2013 and 2014. They gave up and stopped working on the project in

43

November 2014, because they were unable to obtain the requisite water services for developing the Property and entitlements until the infrastructure was enhanced. The infrastructure enhancement required a massive, expensive undertaking of running water lines under the freeway, from a distant reservoir to the Property. This impediment to developing the Property remained at the time of the trial in 2018.

Based on evidence there were no water services for the Property and obtaining them would be a massive, expensive undertaking, the trial court reasonably rejected the expert witness appraisals and concluded the Property's value was "closer to $500,000." The trial court reasonably found that, although the purchase price was $330,000, it was substantially fair and just under the totality of the circumstances. Such circumstances included the above-summarized evidence and evidence that Earl and Yardley negotiated the price in good faith. Although the price may be less than the FMV at that time, it was not an unreasonable price based on evidence the Property could not be developed without a massive, expensive undertaking to obtain water services. And as the trial court noted, "adequate consideration" need not be the full value of the property. It need only be fair and reasonable under all of the circumstances of the case. (*Jenkins v. Teegarden* (2014) 230 Cal.App.4th 1128, 1142; *Meyer v. Benko*, *supra*, 55 Cal.App.3d at p. 945.) We thus conclude the trial court's finding that the $330,000 purchase price was adequate consideration was reasonable and supported by substantial evidence.

## 4. GNLLC's Property Interest

Greif/GNLLC contends the trial court erred in ordering specific performance of the Purchase Agreement because Earl no longer held title to the Property when he sold the Property to Yardley. Before entering into the Purchase Agreement, Earl transferred the Property to GNLLC, a limited liability company (LLC), for the benefit of his grandchildren. Greif argues that, because Earl no longer owned the Property when he signed the Purchase Agreement, title cannot be conveyed to Yardley by ordering specific performance. We disagree.

Earl's estate tax attorney, Lloyd Copenbarger, testified that in November 2012, he assisted Earl in forming GNLLC and an irrevocable grantor trust. Earl transferred the Property to GNLLC and gave a non-management interest in GNLLC to the trust. By doing so, on November 25, 2012, Earl granted his two grandsons, Nicholas and Gabriel, a beneficial ownership interest in the Property. Earl was GNLLC's sole operating officer, with power to contract and dispose of assets of the company.

The transfer of the Property to GNLLC was not recorded until December 20, 2012, two days after Earl signed the Purchase Agreement. Copenbarger testified the transfer merely transferred the Property "from Mr. Greif to Mr. Greif," for no monetary consideration. Copenbarger further testified that GNLLC's "operating agreement specifically gave Mr. Greif the authority to enter into contracts relating to the disposition of that property."

45

The trial court noted in its SOD that the GNLLC operating agreement gave Earl the powers of "entering into, making and performing contracts, agreements, and other undertakings binding the Company [GNLLC]" and "Disposing of any asset of the Company." The trial court concluded Earl and his successor thus held equitable title to the Property through Earl's authority as the sole operating officer of GNLLC, with power to contract and dispose of GNLLC's assets, including the Property.

We agree that, even though Earl transferred title to the Property to GNLLC before selling the Property to Yardley, Earl and his successor held equitable title based on holding contractual power to enter binding contracts on GNLLC's behalf and dispose of GNLLC's assets, including selling the Property. We recognize that, "Although a party may lawfully contract to convey property he does not own [citations], his failure to obtain legal title as a practical matter precludes enforcement of the contract by way of specific performance. [Citations.] Where, however, a party holds the equitable title to realty and has the power to 'call for' legal title, it is established that specific performance is available." (*Walgren v. Dolan* (1990) 226 Cal.App.3d 572, 576, 576 (*Walgren*).)

Greif/GNLLC argues *Walgren* is inapposite because it involved assets held in a trust, whereas the Property was held in an LLC, which is a separate legal entity. In *Walgren*, the trust beneficiary sold real property, which was a trust asset. The purchaser of the property sought specific performance of the contract. The *Walgren* court concluded that, although the beneficiary lacked legal title, the beneficiary held equitable title in the property because, under the terms of the trust, the beneficiary had complete

46

control over disposition of the trust property and had the power to compel the trustee to convey the property. The *Walgren* court stated that, under such circumstances, "we see no reason to deny a party the right to pursue specific property of a trust for which he has a valid sales contract and which the settlor has for all practical purposes treated as his own." (*Walgren*, *supra*, 226 Cal.App.3d at pp. 578-579.) The *Walgren* court thus held that the contract to sell the property was enforceable and, therefore, specific performance was a remedy available to the property purchaser. (*Id*. at pp. 578-579.)

*Walgren* is analogous to the instant case in that, even though GNLLC held legal title to the Property, Earl retained sole control and authority to dispose of GNLLC's assets, including the Property. Earl thus retained equitable title to the Property and could sell the Property to Yardley. Even though *Walgren* involves trust assets and the instant case concerns an LLC asset, we conclude that under *Walgren*, the Purchase Agreement was a valid enforceable contract, and specific performance of the contract was a proper remedy. (*Walgren*, *supra*, 226 Cal.App.3d at pp. 578-579.)

We further note that Earl did not record the GNLLC operating agreement until after signing the Purchase Agreement. Yardley was thus deprived of any notice that Earl had transferred title to the Property to GNLLC. As the court in *Walgren* noted, "[t]he primary purpose of the recording laws is the protection of bona fide purchasers for value and without notice of title defects. [Citation.]" (*Walgren*, *supra*, 226 Cal.App.3d at p. 579.) Furthermore, even if Yardley had been aware of the GNLLC operating agreement,

47

it would have revealed that Earl had the power to sell the Property, and therefore he had the equitable power of entering into the Purchase Agreement. (*Ibid*.)

We thus conclude that when Earl signed the Purchase Agreement, he had retained equitable title to the Property, had full control over the Property, and had legal authority to sell the Property. Earl's transfer of title to GNLLC before selling the Property to Yardley therefore did not bar the trial court from ordering specific performance of the Purchase Agreement.

E. *Conversion*

The trial court found that Earl committed conversion of Yardley's funds by delaying for almost two years signing escrow cancellation instructions required to release Yardley's funds deposited in escrow. Greif/GNLLC contends the trial court erroneously awarded duplicative damages and failed to credit Greif/GNLLC for the Property's carrying costs paid after Earl signed the Purchase Agreement. Greif/GNLLC argues Yardley is not entitled to interest on its $335,000 in funds deposited in escrow. In addition, Greif/GNLLC argues it should receive an offset for all taxes paid on the Property from the time of the sale, up until the Property is transferred to Yardley. Otherwise, Yardley will receive duplicative benefits consisting of use of the purchase funds (interest) and GNLLC's payment of the property taxes on the Property. Greif/GNLLC asserts this would constitute an unjust, inequitable windfall for Yardley.

"Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to

48

possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages.  Conversion is a strict liability tort.  The foundation of the action rests neither in the knowledge nor the intent of the defendant. Instead, the tort consists in the breach of an absolute duty; the act of conversion itself is tortious.  Therefore, questions of the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial." (*Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1066.)

Conversion damages are calculated based on the detriment caused to the plaintiff. Such detriment caused by wrongful conversion of personal property is presumed to be the "value of the property at the time of the conversion, with the interest from that time, or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted."  (§ 3336.)  "'Money may be the subject of conversion if the claim involves a specific, identifiable sum.'"  (*Fong v. E.W. Bank* (2018) 19 Cal.App.5th 224, 231, quoting *Welco Electronics, Inc. v. Mora* (2014) 223 Cal.App.4th 202, 209 [depositor of money in bank may pursue conversion action against the bank that held or failed to release money.].)

Even though the escrow company, not Earl, had possession of Yardley's funds for almost two years, Earl acted wrongfully in delaying the release of the escrow funds to Yardley.  "[A] conversion claim does not require that a specific lump sum of money be entrusted to defendant; the plaintiff must merely prove a specific, identifiable sum of

money that was taken from it." (*Welco Electronics, Inc. v. Mora*, *supra*, 223 Cal.App.4th at p. 216.) Substantial evidence supports such a finding here where there is evidence Greif unjustifiably delayed signing escrow cancellation instructions, which resulted in tying up Yardley's money for almost two years. The Purchase Agreement contemplated the escrow deposit funds would only briefly remain in escrow, which was to close within 15 days of acceptance of the Purchase Agreement on December 18, 2012. Instead, Yardley's $335,000 escrow deposit was tied up in escrow for nearly two years, until Greif finally signed escrow cancellation instructions releasing the funds on January 30, 2015.

After Earl attempted to cancel the Purchase Agreement, he was obligated under the Purchase Agreement provisions regarding cancellation to sign escrow cancellation instructions releasing Yardley's escrow deposit funds. Yardley signed escrow cancellation instructions on March 31, 2013, and requested Earl to do so as well for the purpose of releasing Yardley's escrow deposit. Earl delayed signing the escrow cancellation instructions releasing Yardley's $335,000 escrow deposit for almost two years. Under such circumstances, the trial court properly awarded Yardley conversion damages, consisting of interest on Yardley's $335,000 from March 31, 2013, until the funds were released from escrow on January 30, 2015.

Greif/GNLLC's reliance on *Ellis v. Mihelis* (1963) 60 Cal.2d 206, 220-221 (*Ellis*), for the proposition the court improperly ordered specific performance of the Purchase Agreement and awarded interest on the escrow deposit is misplaced. In *Ellis*, the plaintiff entered into a contract with the defendant to purchase a ranch upon which a home was

50

built. The defendant delayed completing the terms of the contract. The plaintiff obtained a decree of specific performance for the defendant's failure to complete the transaction. The trial court additionally awarded the plaintiff the profits on the ranching operations, the rental value of the ranch home, and 7 percent interest on the $35,000 escrow deposit. The case was reversed, however, because of the trial court's failure to allow an interest offset to the defendant seller against the profits accruing after the contract completion date. (*Id*. at p. 222.)

The *Ellis* court reasoned that the seller was entitled to an offset because the purchaser would have had the use of the purchase funds during the delay in performance of the contract. (*Ellis*, *supra*, 60 Cal.2d at pp. 220-221.) The *Ellis* court relied on the well-established principle that "the parties should be placed in the same position as if the contract had been performed." (*Id*. at p. 221.) The *Ellis* court explained that "[t]he guiding principle with respect to the calculation of the damages incident to the decree of specific performance, as we have seen, is to relate the performance back to the date set in the contract. Timely performance of the contract would result in the purchaser's receiving the rents and profits of the land but being denied the use of the purchase money, and a purchaser who seeks to recover rents and profits must permit an offset for his use of the purchase funds during the period that performance was delayed." (*Id*. at p. 220.)

The *Ellis* court also concluded that it was "error to award [the purchaser] interest on the $35,000 placed in escrow because, as we have seen, he would have been deprived of the use of that money had the contract been timely performed." (*Ellis*, *supra*, 60

51

Cal.2d at p. 222.)  This case is distinguishable in that Greif not only refused to perform the contract, but also wrongfully refused to release Yardley's $335,000 escrow deposit. Greif was required to release the escrow deposit under the Purchase Agreement upon repudiating the Purchase Agreement, yet wrongfully retained control over Yardley's escrow deposit funds for nearly two years by failing to sign escrow cancellation instructions until January 30, 2015.

Had the Purchase Agreement been performed according to its terms, Greif would have timely completed the sale within 15 days of acceptance of the Purchase Agreement on December 18, 2012, and Yardley's purchase funds would not have been tied up for almost two years.  But, also, had Greif complied with the Purchase Agreement terms upon repudiating the Purchase Agreement, he would have released Yardley's escrow deposit, instead of tying up Yardley's funds for nearly two years.  By ordering specific performance of the Purchase Agreement and ordering interest accruing on the wrongfully retained escrow funds after the contract performance date, the parties were placed in the same position as if Greif had complied with all of the terms of the Purchase Agreement, including the contract provision requiring release of the escrow deposit upon repudiation of the contract.

We therefore conclude the trial court appropriately compensated Yardley for losses occasioned by Earl's conduct amounting to conversion.  (Cal. Const. art. 15, § 1; Civ. Code, § 3287.)  We further conclude Greif/GNLLC is not entitled to a property tax offset because Greif/GNLLC asserted title and retained possession of the Property, with

all the benefits of property ownership up until the trial court entered judgment enforcing the Purchase Agreement and ordering transfer of title.

The concurrence/dissent concludes the trial court erred in awarding Yardley interest on the escrow deposit funds because under *Bravo v. Buelow* (1985) 168 Cal.App.3d 208, 213 (*Bravo*), the trial court decree of specific performance of the Purchase Agreement requires the court to treat the parties as if the change in ownership had taken place as the contract originally intended. The concurrence/dissent states that by doing so, this court must treat Greif/GNLLC as the owner of the escrow funds, in which case Yardley would not be entitled to interest on those funds. We respectfully disagree. The general principle that "the parties should be placed in the same position as if the contract had been performed," does not preclude awarding Yardley conversion damages for wrongfully tying up Yardley's escrow deposit funds for nearly two years. (*Ellis v. Mihelis*, *supra*, 60 Cal.2d at p. 221.) Under the Purchase Agreement, Greif was required to return the escrow deposit to Yardley when Greif repudiated the Purchase Agreement. Greif failed to do so. Under such circumstances, Greif/GNLLC committed conversion of the funds and Yardley was entitled to damages, regardless of whether the court ultimately granted specific performance of the agreement.

We also respectfully disagree with the concurrence/dissent's assertion that the interest awarded to Yardley on the conversion cause of action was improper because it was not a real amount earned but, rather, was calculated using a statutory rate for prejudgment interest awards. The trial court reasonably calculated the conversion damages by applying the statutory rate for prejudgment interest awards to the escrow

53

funds Greif failed to release upon repudiating the Purchase Agreement. (See *Bravo*, *supra*, 168 Cal.App.3d at p. 215.) The conversion damages were reasonably based on the trial court finding that, as a result of Greif failing for almost two years to agree to release the escrow funds to Yardley as required under the Purchase Agreement, Yardley sustained a financial loss of not being able to use those funds.

The remedies of specific performance and conversion damages in this case are not inconsistent or improper. The conversion damages were not awarded based on the Purchase Agreement terms requiring the transfer of title to Yardley. The conversion damages were based on the contract provisions requiring release of the escrow deposit upon a party to the contract repudiating or canceling the contract. Unlike in *Bravo*, *supra*, 168 Cal.App.3d 208, the conversion claim for interest damages was a separate claim, independent from enforcement of the Purchase Agreement.

In *Bravo*, the court ordered specific performance requiring the seller to convey a lot to the purchaser and, as incidental compensation, also awarded the increased costs of construction caused by the seller's refusal to perform the purchase agreement, resulting in the delay in the purchaser's intended construction of a home on the lot. (*Bravo*, *supra*, 168 Cal.App.3d p. 213.) The court in *Bravo* explained: "'In California the compensation which may be awarded incident to a decree of specific performance is not for breach of contract and is not legal damages. The complainant affirms the contract and asks that it be performed. Since the time for performance has passed, the court relates that performance back to that date, by treating the parties as if the change in ownership had taken place at that time.'" (*Id*. at p. 213, quoting *Hutton v. Gliksberg* (1982) 128

Cal.App.3d 240, 248.)  Unlike in *Bravo* and *Ellis*, the interest damages for conversion were awarded based on the separate conversion claim that Greif wrongfully retained dominion and control over Yardley's escrow deposit funds, which Greif was required under the Purchase Agreement to return to Yardley when Greif refused to perform the Purchase Agreement.

Awarding Yardley interest damages on the conversion claim for Greif's failure to release the escrow funds after refusing to perform the Purchase Agreement is completely in harmony with the principle that the parties should be placed in the same position as if the contract had been performed.  The specific performance decree and conversion damages are founded on different, independent theories and the remedies are not duplicative or inconsistent.  Under such circumstances, the trial court properly ordered specific performance of the Purchase Agreement and awarded conversion damages for Greif's wrongful failure to release Yardley's escrow deposit upon repudiating the Purchase Agreement.  This placed the parties in the same position as if the contract had been performed according to the terms of the Purchase Agreement.

Furthermore, not only was interest on the escrow deposit funds separately recoverable as conversion damages, the interest was also recoverable as reasonable equitable compensation incident to specific performance of the Purchase Agreement, based on Yardley's loss of use of the escrow deposit funds which should have been returned to Yardley when Earl repudiated the Purchase Agreement.  (*Bravo*, *supra*, 168 Cal.App.3d at p. 215.)

IV.

GREIF'S APPEAL OF POSTJUDGMENT

ATTORNEY FEES AWARD (Third Appeal)

In the third appeal (case no. E073786), Greif objects to the trial court's postjudgment order awarding attorney fees to Yardley. Greif contends Yardley is barred from recovering attorney fees under the Purchase Agreement mediation clause.

After prevailing at trial, Yardley filed a motion for attorney fees, which the trial court heard and granted. The trial court awarded Yardley $776,757.88 in attorney fees under the Purchase Agreement attorney fees provision. Greif contends the attorney fees award should be reversed because Yardley failed to comply with the pre-litigation mediation requirement in the Purchase Agreement. Greif argues that, in order to preserve Yardley's right to seek attorney's fees, Yardley was required to mediate its claims before filing suit. Yardley argues the Purchase Agreement includes an express exception to the mediation requirement, which applies.

"On appeal, we review the determination of the legal basis for an award of attorney fees de novo as a question of law. [Citation.]" (*Blackburn v. Charnley* (2004) 117 Cal.App.4th 758, 767.)

The Purchase Agreement provides in paragraph 26, entitled "Attorney Fees," that in any action arising out of the Purchase Agreement, "the prevailing Buyer or Seller shall be entitled to reasonable attorney fees and costs from the non-prevailing Buyer or Seller, except as provided in paragraph 31A." Paragraph 31 of the Purchase Agreement is

56

entitled "Dispute Resolution." Paragraph 31A, entitled "Mediation," states that, if any party "commences an action without first attempting to resolve the matter through mediation, . . . then the party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action. . . . Exclusions from this mediation agreement are specified in paragraph 31C."

Paragraph 31C, entitled "Exclusions," states: "The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver or violation of the mediation and arbitration provisions." The lis pendens exception to mediation serves the purpose of enabling a plaintiff claiming a disputed interest in real property to preserve the property during the pendency of the dispute. Filing a complaint alleging a disputed interest in real property is generally a prerequisite to filing and recording a notice of pending action (lis pendens).

On February 8, and May 29, 2013, Yardley's attorneys sent Earl letters stating that if they did not hear back regarding compliance with the Purchase Agreement or signing the escrow cancellation instructions, Yardley would "file a complaint for specific performance/breach of contract and record a lis pendens on the Property." Greif did not respond. On September 25, 2013, Yardley filed its Complaint for specific performance, and on January 14, 2014, Yardley filed a notice of pendency of action, which was recorded on February 7, 2014.

After Yardley's initial unsuccessful informal efforts to settle, on February 4, 2014, Yardley's attorney sent Earl's attorney a letter requesting mediation. In March 2014, Yardley served Earl with the Complaint and notice of lis pendens. The parties participated in mediation on May 23, 2014, with Judge Robert Taylor, which ended when Earl's attorney asserted mediation was futile because Earl was incapable of proceeding with mediation. Thereafter Mark Greif substituted in for Earl and the parties participated in another mediation attempt and two settlement conferences, without resolving the case. The only action Yardley took in furtherance of its lawsuit before the first mediation was filing the lawsuit, recording the lis pendens, serving the summons, and filing an amended complaint after Earl revealed for the first time in January 2014, that title to the Property had been transferred to GNLLC.

When ruling on Yardley's motion for attorney fees, the trial court concluded the lis pendens exception to the mediation requirement applied. The trial court found that Yardley filed its lawsuit for specific performance "to enable the recording" of a lis pendens. The trial court noted that the filing of the lis pendens several months after Yardley filed its complaint for specific performance did not bar application of the lis pendens exception to mediation. We agree. Yardley's attorney's letters, sent to Earl before filing the complaint, show that the complaint and lis pendens were integrally related even though they were not filed at the same time. In addition, both the complaint and lis pendens were served on Greif at the same time.

58

This case is analogous to *Blackburn v. Charnley*, *supra*, 117 Cal.App.4th 758.  In *Blackburn*, the court held that the lis pendens exception to mediation included in the parties' real property purchase agreement applied.  (*Id*. at p. 768.)  The *Blackburn* court explained:  "Here, the parties filed a lawsuit and recorded a lis pendens on their lots in order to protect their homes from resale to a bona fide purchaser in a booming real estate market and to preserve their right to seek specific performance.  Under the plain and unambiguous provisions of the purchase agreements, they were exempt from the mediation requirement.  We agree with the trial court that the couples were entitled to attorney's fees as the prevailing parties."  (*Ibid*. at p. 768.)  Under *Blackburn*, we conclude the lis pendens exception to mediation applies and Yardley is therefore entitled to recover its attorney fees.

Greif argues that the arbitrations statutes, Code of Civil Procedure sections 1281.8 and 1298.5, support his argument that the lis pendens exception does not apply.  Those statutes apply where parties have agreed to attempt to resolve a dispute by arbitration before proceeding with court litigation.  The arbitration statutes include a lis pendens exception that allows a party to file a lawsuit for the limited purpose of recording a lis pendens, but the filing party must immediately stay the lawsuit in order to preserve its right to arbitrate.  Greif argues the arbitration statutes are relevant in this case to construing the Purchase Agreement mediation clause and lis pendens exception.

We disagree.  The arbitration statutes do not apply to the mediation requirement in the Purchase Agreement.  Furthermore, the language in the arbitration statutes is

significantly different than the language in the Purchase Agreement mediation provisions. There is no mention in the Purchase Agreement mediation provisions of staying court proceedings after filing a complaint and lis pendens, although Yardley, in effect, did so during the initial mediation. The arbitration statutes simply do not have any bearing on awarding attorney fees in the instant case.

Greif's reliance on *Frei v. Davey* (2004) 124 Cal.App.4th 1506, 1508, is also misplaced. *Frei* is distinguishable in that the real property sellers in *Frei* rejected the buyers' initial request to mediate, required under the purchase agreement. The defendants eventually participated in mediation, but at the request of another party nearly one year later, on the eve of trial. The court found that the sellers' refusal to mediate could not be cured one year later. (*Id*. at p. 1517.)

Unlike in *Frei*, the lis pendens exception to the mediation requirement applies. In addition, Yardley did not refuse any request to mediate. On the contrary, Yardley made numerous attempts to contact Earl in an attempt to resolve the dispute informally before filing its lawsuit. Because Earl did not respond to Yardley's overtures to resolve the dispute informally, Yardley filed a complaint and lis pendens, but did not serve them on Earl until after formally requesting mediation. Thereafter, the parties engaged in mediation, during which Yardley delayed litigating the dispute.

We conclude that, under the totality of the circumstances, the trial court correctly applied the lis pendens exception to the Purchase Agreement mediation requirement, and found that Yardley was entitled to recover attorney fees under the attorney fees clause.

V.

DISPOSITION

The judgment on the Complaint and Cross-complaint is affirmed.  The post-judgment award of attorney fees and costs is also affirmed.  Yardley is awarded its costs on appeal.

CERTIFIED FOR PUBLICATION


CODRINGTON          
J.


I concur:


McKINSTER          
          Acting P. J.


61

[*Greif v. Sanin et al.*, E070283]

RAPHAEL, J., Concurring and Dissenting.

The trial court found that Earl Greif breached his December 18, 2012 contract to sell The Yardley Protective Limited Partnership ten acres of raw land in Rancho Mirage for $330,000.[1] As a remedy, the court awarded Yardley specific performance of that agreement, explaining that "allowing [Greif] to keep the property—which is worth substantially more than $1.25 million today—would give [Greif] a windfall" despite breaching the contract. The court ordered that remedy despite recognizing that as of the December 2018 judgment "the $330,000 purchase appears to be meaningfully below the market value" of the property.

I agree with the majority opinion insofar as it upholds this determination, which amply compensated Yardley in this matter. The equitable remedy of specific performance treats the parties as if the contract was performed as agreed in 2012, allowing Yardley to pay $330,000 for property that had appreciated to above $1.25 million; indeed, the court found that the property had been worth as little as $500,000 on the date of the contract. The specific performance remedy enabled Yardley to receive a huge amount of value.

---

[1] As the majority opinion does, I will refer to the sellers as "Greif" and the buyers as "Yardley."

1

I respectfully disagree, however, with the majority's decision to uphold the trial court's award of *additional* monetary damages to Yardley on a theory inconsistent with the specific performance remedy. The trial court awarded $43,040.80 in damages to Yardley because Greif kept the purchase money in escrow for two years before returning it. Damages for conversion of property was a viable theory for Yardley as an *alternative* to specific performance. The problem here, however, is that the specific performance remedy treats the escrow money as having been provided to Greif in 2012 for the property. Once the court applied specific performance as the remedy, damages for conversion should have been unavailable. Under specific performance, it was Greif's money, so Yardley suffered no harm by Greif's keeping it. Because the conversion damages are inconsistent with specific performance, I respectfully dissent from section III.E of the majority opinion. I join the rest of the opinion.

DISCUSSION

The trial court's award of specific performance due to breach of the purchase agreement, which we affirm, means that we are "'treating the parties as if the change in ownership had taken place'" as the contract originally intended. (*Bravo v. Buelow* (1985) 168 Cal.App.3d 208, 213.) Among other things, that means treating the seller, Greif, as receiving the escrow funds soon after Yardley deposited them. (*Ibid.* [court order for specific performance "'must as nearly as possible order it to be performed according to its terms, and one of those terms is the date fixed by it for its completion'"].) The

2

purchase agreement is being "'enforced retrospectively'" (*ibid.*), and we are treating Greif as the owner of the escrow funds.

The damage award for conversion, however, presumes the opposite: that the escrow funds rightfully belonged to Yardley. That is why the opinion says that Greif's wrongful actions "resulted in tying up Yardley's money." (Maj. opn., *ante*, at p. 50.) Conversion also presumes that the contract ultimately falls through, because only then would the money still be Yardley's, such that he receives an award of interest on it.

A judgment should not treat both theories as simultaneously true. If a court orders specific performance, then it is enforcing the purchase agreement. If a court finds a seller converted funds in escrow, then it is treating the matter as if the transaction was thwarted. Yardley "'cannot have it both ways, performed and broken.'" (*Bravo v. Buelow*, *supra*, 168 Cal.App.3d at p. 213.) Unless Yardley would prefer to take a damages award and not receive the property through the equitable contract remedy of specific performance, we should reverse the award of interest in its favor on the cause of action for conversion.

Yardley could properly take *to trial* causes of actions that could lead to inconsistent remedies, and "need not elect, and cannot be compelled to elect, between inconsistent remedies during the course of trial prior to judgment." (*Roam v. Koop* (1974) 41 Cal.App.3d 1035, 1039.) But electing a judgment based on one remedy precludes an inconsistent one. (*Vlahovich v. Cruz* (1989) 213 Cal.App.3d 317, 323.) Enforcing the contract through specific performance construes the funds not to be Yardley's, because he purchased the property with them. Because this way of construing

3

the facts is inconsistent with a conversion theory, the inapt way that the majority holds that Yardley satisfied the first element of conversion—that Yardley have "ownership or right to possession of the property" (*Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1066)—is by saying merely that Earl "acted wrongfully." (Maj. opn., *ante*, at p. 49.)

Once the remedy of specific performance is chosen, however, the interest on the money deposited in escrow is not Yardley's. Yardley is treated as having paid that money to Greif for the property at the time he should have purchased the land under the contract, and is compensated with title to the land itself; that is, the entire value of the land since that purchase. Viewed in this way, interest earned on the funds should be retained by Greif, who should have had the money rather than the property. (See *Kassir v. Zahabi* (2008) 164 Cal.App.4th 1352, 1358 ["a seller . . . must be treated as if he had performed in a timely fashion and is entitled to receive the value of his lost use of the purchase money during the period performance was delayed"].) The $43,040.80 interest awarded to Yardley on the conversion cause of action was not a real amount earned, but rather was calculated using a statutory rate for prejudgment interest awards; such an award should not be made to either party with the specific performance ordered here. In contrast to interest on the funds, if there were any monetary benefit from owning the land during the escrow, that should be awarded to Yardley as part of the specific performance remedy. (See *D-K Investment Corp. v. Sutter* (1971) 19 Cal.App.3d 537, 549 [seller "is chargeable with the rents and profits received less taxes and other authorized expenses"].) Yardley is thus properly awarded the sizeable appreciation in the land's value.

The majority correctly notes that if the purchase agreement had been executed according to its terms, Yardley's purchase funds would have been released, rather than tied up in escrow for two years.  (Maj. opn., *ante*, at p. 52.)  But the funds would have been released *to Greif* to pay for the property, not to Yardley.  Our Supreme Court in *Ellis v. Mihelis* (1963) 60 Cal.2d 206 followed the correct reasoning by applying specific performance to somewhat similar facts.  It held that it was "error to award [the buyer] interest on the $35,000 placed in escrow because . . . he would have been deprived of the use of that money had the contract been timely performed."  (*Id.* at p. 222.)

It does not make sense to distinguish *Ellis* on the basis that Greif "wrongfully refused to release" Yardley's escrow deposit.  (Maj. opn., *ante*, at p. 52.)  Once Yardley chose the specific performance remedy, it was awarded the entire value of the land as if his escrow funds had been timely exchanged for it under the contract.  Under that view, the escrow deposit was not Yardley's at the time that Greif kept it.  It was Greif's.  The majority thus errs in affirming both the specific performance remedy and the conversion damages.  Specific performance gives Yardley the full benefit of its 2012 bargain, and it incidentally even had use of the purchase funds for four of the years after it was deemed to have paid them; the damages award improperly provides it as well with a yet "greater amount . . . than [it] could have gained by the full performance."  (Civ. Code. § 3358.)  We should not turn back the clock, enforce the sale, and then *also* give redress for some event that would never have happened had the original sale occurred according to its terms.  Rather, as our Supreme Court stated (*Ellis v. Mihelis*, *supra*, at p. 221), our

5

decision should instead be in complete "harmony with the principle that the parties should be placed in the same position as if the contract had been performed."

RAPHAEL J.